# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 19, 2006          Decided March 16, 2007

No. 05-1416

CARPENTERS AND MILLWRIGHTS, LOCAL UNION 2471,
AFFILIATED WITH UNITED BROTHERHOOD OF CARPENTERS
AND JOINERS OF AMERICA,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

A. J. MECHANICAL, INC., ET AL.,
INTERVENORS

———

Consolidated with
06-1098

———

On Petitions for Review of an Order of the
National Labor Relations Board

———

*Osnat K. Rind* argued the cause and filed the briefs for petitioner.

*Ruth E. Burdick*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Julie B. Broido*, Senior Attorney.

*William H. Andrews* was on the brief for intervenors A.J. Mechanical, Inc., et al.

Before: RANDOLPH, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: The National Labor Relations Board found that a company and its two owners committed a series of flagrant violations of the National Labor Relations Act. Although the Board ordered the company to provide backpay to the victims of its unfair labor practices, by that time the co-owners had distributed all of the company's funds to themselves. In a subsequent compliance proceeding, an administrative law judge pierced the corporate veil and imposed personal liability on one of the owners. The Board, however, reversed. Because the Board failed to cite evidence sufficient to support the findings upon which it based its refusal to pierce the veil, and further failed to explain why it disregarded significant contrary evidence, we set aside that aspect of the Board's order.

I

A.J. Mechanical, Inc. was a Florida company that specialized in refurbishing gas turbines. William A. Greene and James Sanders founded the company and were its sole stockholders and directors. Throughout their stewardship of

A.J. Mechanical, Greene and Sanders commingled their personal funds and assets with those of the company, disregarded corporate formalities and procedures, failed to maintain separate corporate records, and kept the company in an undercapitalized state.[1]

In late 1998, petitioner Carpenters and Millwrights, Local Union 2471 launched a campaign to organize the employees of A.J. Mechanical. The company actively opposed the union's organizing efforts through a variety of tactics, many of which were clear violations of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* As the National Labor Relations Board (NLRB) subsequently found, those violations included: barring employees from speaking about the union; interrogating employees about their membership in and support for the union; promising benefits for ceasing pro-union activity and threatening reprisals for continuing such activity; threatening employees with plant closure, loss of jobs, loss of benefits, and discharge because of their activities on behalf of the union; and laying off or firing employees, and refusing to consider job applicants, because of their support for the union. The company's unlawful conduct began in October 1998 and continued through May 1999. Much of it took place between December 1998 and early February 1999, and much of it involved Greene and Sanders personally.

---

[1]The facts set forth in Part I of this opinion are taken from the Board's initial and supplemental decisions, and from the administrative law judge's supplemental decision. *See* Supplemental Decision and Order, *A.J. Mechanical, Inc.*, 345 NLRB No. 22, at 1-5 (Aug. 26, 2005) (Board); Decision and Order, *A.J. Mechanical, Inc.*, 330 NLRB No. 178 (Apr. 14, 2000) (Board); Supplemental Decision, *A.J. Mechanical, Inc.*, 345 NLRB No. 22, at 6-12 (Jan. 23, 2002) (ALJ). None of these facts were disputed in the Board's supplemental decision and order, which is on review here.

In the midst of their battle against the union, Greene and Sanders wrote themselves a series of checks on the company's bank account. In the first distribution, made on February 16, 1999, each received $225,000. Over the next ten months, both Greene and Sanders received nine additional distributions. The total paid to each man exceeded $1.8 million.

On May 24, 1999, the union filed the first of a series of charges with the NLRB, alleging that A.J. Mechanical had committed unfair labor practices in violation of the NLRA. In July 1999, the union prevailed in a representation election and was certified as the representative of a unit of A.J. Mechanical employees. Later that month, the NLRB's General Counsel issued the first of two complaints against the company.

On or about September 11, 1999, A.J. Mechanical ceased all operations. Immediately thereafter, it auctioned off all of its property and equipment. Greene and Sanders executed a resolution to liquidate the company on December 2, 1999, and filed articles of dissolution with Florida's Secretary of State on June 16, 2000.

Meanwhile, A.J. Mechanical failed to answer the General Counsel's unfair labor practice complaints. After several months of silence, the General Counsel moved for summary judgment, and the NLRB issued a notice to show cause why that motion should not be granted. The company again failed to respond. On April 14, 2000, the Board found that A.J. Mechanical had engaged in the above-described unfair labor practices, and that Greene and Sanders were personally involved in many of them. The Board ordered the company to provide backpay to its employees to make them whole for the losses they sustained as a result of the company's unlawful conduct. The United States Court of Appeals for the Eleventh Circuit enforced the Board's order in full. *See* Decision and Order, *A.J.*

*Mechanical, Inc.*, 330 NLRB No. 178 (Apr. 14, 2000), *enforced*, No. 00-14628I (11th Cir. Oct. 23, 2000) (unpublished judgment).

Thereafter, disputes arose over the amount of backpay due under the Board's order and whether Greene, Sanders, and their wives (who shared equally in the distributions) were personally liable for the company's obligations. In February 2002, Sanders and his wife agreed to pay $112,500 to settle any backpay claims against them. The Greenes did not settle. In October, the Board's Regional Director initiated a compliance proceeding to determine two issues: (1) "the amount of backpay due employees who suffered financial consequences as a result of the unfair labor practices of the now-defunct" company; and (2) whether Greene and his wife "should be held personally liable for such backpay." Supplemental Decision and Order, *A.J. Mechanical, Inc.*, 345 NLRB No. 22, at 1 (Aug. 26, 2005). Although the company failed to answer the compliance specification, the Greenes appeared personally and testified at the compliance hearing.

Following the hearing, the administrative law judge (ALJ) issued a supplemental decision, in which he determined that the total amount of backpay owed was $462,755 and that Greene and his wife were personally liable for repayment. Supplemental Decision, *A.J. Mechanical, Inc.*, 345 NLRB No. 22, at 6-12 (Jan. 23, 2002). In deciding to "pierce the corporate veil," the ALJ applied the test adopted by the Board in *White Oak Coal Co.*:

> [T]he corporate veil may be pierced when: (1) the shareholder and corporation have failed to maintain separate identities, and (2) adherence to the corporate structure would sanction a fraud, promote injustice, or lead to an evasion of legal obligations.

318 NLRB 732, 732 (1995). After reviewing Greene's "misuse of the corporate assets and form" and the large cash distributions that he received in 1999, the ALJ found that both prongs of the *White Oak* test were satisfied. 345 NLRB No. 22, at 10-11. The ALJ concluded: "the Greenes along with James Sanders, engaged in blurring the separate corporate entity of A.J. Mechanical, Inc.[,] and their misuse of the corporate assets and form[] is unfair, unjust, and has resulted in an evasion of A.J. Mechanical's remedial and backpay obligations for unfair labor practices that . . . Greene and others[] committed." *Id.* at 11. In reaching this decision, the ALJ determined that Greene "was not credible," and stated that he did "not credit any of [Greene's] testimony, except that which other, credited, evidence corroborates or that which constitutes an admission against interest." *Id.* at 9.

On appeal, the Board's supplemental decision and order affirmed the backpay judgment against the company, but reversed the ALJ's decision to hold the Greenes personally liable. Supplemental Decision and Order, *A.J. Mechanical, Inc.*, 345 NLRB No. 22, at 1-5 (Aug. 26, 2005); *see* Revised Supplemental Order, *A.J. Mechanical, Inc.* (NLRB Mar. 17, 2006) (unpublished). The Board did not question the ALJ's credibility determinations. 345 NLRB No. 22, at 1 n.1. And it accepted "arguendo the judge's conclusion . . . that the separate legal identity of Respondent A.J. Mechanical, Inc. had not been maintained under the first prong of the *White Oak Coal* standard." *Id.* at 3. Nonetheless, the Board concluded that the second prong of the *White Oak* test was not satisfied, disagreeing with the ALJ that "adhering to the corporate form would permit a fraud, promote injustice, or lead to an evasion of legal obligations." *Id.* (internal quotation marks omitted).

Specifically, the Board held that "the timing of the corporate distributions does not support the judge's conclusion

that adherence to the corporate form would lead to the evasion of legal obligations." *Id.* The Board noted that "[t]he unfair labor practice charges were filed in May 1999 and the complaint was issued in July 1999," and found that "it was not until these dates that . . . Greene was aware that the [company's] actions were being challenged and that monetary liability could result." *Id.* It also found that "the process of closing down (and the attendant distribution of assets to shareholders) began before those dates." *Id.* Hence, in the Board's view, the distributions did not constitute an evasion of the company's legal obligations.

This matter is before us on the Board's application for enforcement of its August 26, 2005 supplemental decision and order against A.J. Mechanical, and the union's petition for review of the veil-piercing component of that decision and order. We will not waste ink on the Board's application for enforcement against the company. A.J. Mechanical did not contest the issue, and it is our longstanding rule that "[t]he Board is entitled to summary enforcement of the uncontested portions of its order[s]." *Flying Food Group, Inc. v. NLRB*, 471 F.3d 178, 181 (D.C. Cir. 2006). We therefore turn to the only contested issue: the Board's refusal to pierce the corporate veil.

II

"We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Mohave Elec. Coop., Inc. v. NLRB*, 206 F.3d 1183, 1188 (D.C. Cir. 2000) (internal quotation marks and citation omitted); *see* 29 U.S.C. § 160(e), (f). As the Supreme Court held in *Universal Camera Corp. v NLRB*, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." 340 U.S.

474, 488 (1951). Thus, where the record evidence is in conflict, the substantial evidence test requires the Board "to take account of contradictory evidence," *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003), and to explain why it rejected evidence that is contrary to its finding, *see Int'l Union, UAW v. Pendergrass*, 878 F.2d 389, 392 (D.C. Cir. 1989) (noting that, to withstand substantial evidence review, an agency must "present its reasons for rejecting significant contrary evidence" (internal quotation omitted)). Similarly, to avoid a determination that it has acted arbitrarily, "the Board, like every other administrative agency, must provide a logical explanation for what it has done." *Lee Lumber & Bldg. Material Corp. v. NLRB*, 117 F.3d 1454, 1460 (D.C. Cir. 1997) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Our review of the Board's refusal to pierce A.J. Mechanical's corporate veil focuses on two findings that undergird the Board's conclusion that declining to pierce the veil would not "sanction a fraud, promote injustice, or lead to an evasion of legal obligations." 345 NLRB No. 22, at 2 (internal quotation omitted). Those two findings are: (1) that "it was not until" the union filed unfair labor practice charges on May 24, 1999, that "Greene was aware that . . . monetary liability could result" from the company's conduct; and (2) that "the process of closing down (and the attendant distribution of assets to shareholders) began before" that date. *Id.* at 3. The Board's conclusion that Greene did not "strip[] the Company of its assets in order to defeat a Board Order," *id.* at 4, and hence that recognizing the corporate form would not permit an evasion of the corporation's legal obligations, depends upon the validity of those findings.

9

A

We begin with the Board's finding that Greene was unaware that A.J. Mechanical's conduct could result in monetary liability until the union filed its first unfair labor practice charges in May 1999. Neither the Board's opinion nor its appellate brief cited any evidence supporting that finding. The alternative view, urged by the union, is that Greene knew that the company could be held liable as soon as he and his agents engaged in patently illegal conduct -- well before the first distributions of the company's cash.

Surely it is reasonable to infer that a thief who robs a bank in broad daylight knows well before the date of his indictment that he may one day face criminal liability. The corporate conduct at issue here was the labor-law equivalent of a daylight robbery. It was neither subtle nor close to the line of legality. The Board found that the company had, among other things: prohibited employees from speaking about or soliciting for the union; interrogated employees about their and other employees' membership in and support for the union; promised employees benefits if they ceased their activities on behalf of the union; and threatened employees with unspecified reprisals, plant closure, loss of jobs, loss of benefits, and discharge because of their activities on behalf of the union. 330 NLRB No. 178, at 1-2. The Board also specifically found that the company fired two employees, laid off and refused to recall or rehire a dozen employees, and refused to consider hiring twenty-three employees, all "because the named employees formed and assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities." *Id.* at 3. Much of the unlawful conduct took place between December 1998 and early February 1999, *see id.* at 1-3, before the first distribution of the company's cash on February 16, 1999.

Moreover, the NLRB found that Greene had personally engaged in many of the company's unlawful acts, again well before he began writing company checks to himself. On two occasions in December 1998 and one in early January 1999, Greene "threatened [company] employees with plant closure and loss of jobs because of their activities on behalf of the Union." *Id.* at 2. On two occasions in December and two in January, he told "employees that [the company] was not hiring any more employees who supported the Union." *Id.* On two days in December and one in January, he "threatened [company] employees that he would shut down the job and reopen using employees who did not support the Union." *Id.* At the end of December and in mid-January, Greene "threatened that [the company] would move its business if the employees did not cease their activities on behalf of the Union." *Id.* On January 16, he "discarded numerous application[s] because [the] applicants indicated support for the Union." *Id.* And on five occasions between December 18 and February 1, Greene told "employees that it would be futile for them to select the Union as their bargaining representative." *Id.* at 1.

It is hard to believe that anyone in Greene's position could have been unaware that the conduct just described could result in monetary liability for A.J. Mechanical. In any event, the Board did not explain why it reached the contrary conclusion. At oral argument, Board counsel insisted that there are no cases in which unfair labor practices alone were found to put a company or its owner on notice of potential liability. Nor, however, are there any cases holding that such practices are insufficient to do so. The *Fullerton* case cited by counsel at oral argument is plainly inapposite. *See NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331 (6th Cir. 1990). Although the unfair labor practices at issue there did take place before the company began winding up its operations, the court declined to pierce the corporate veil because all of the company's assets

were used to pay its bona fide creditors; none were distributed to its owners. *See id.* at 334-35, 341-42.

The NLRB's Regional Director, at least, thought that a notice theory based on the owners' unlawful conduct could be applied in this case. His compliance specification stated:

> *Since about January 1999*, Respondent[s] Greene and James Sanders, in their respective capacities as shareholders, directors, officers and supervisors of [A.J. Mechanical], were on notice of the potential liability of [the company] for its unfair labor practices, *as a direct result of their personal involvement, management and commission of [A.J. Mechanical's] unfair labor practices* as found in the Board's Order.

Joint Appendix (J.A.) 235a-b (emphasis added).[2] Perhaps the Board had some reason for concluding that the conduct at issue here was insufficient to put Greene on notice of the company's potential liability. Or perhaps the Board concluded that, as a matter of law, even blatantly unlawful conduct is insufficient to do so. But if it reached either conclusion, the Board did not say so, let alone provide a logical explanation for such a counterintuitive result. Without such an explanation, its decision cannot stand.

---

[2]The specification further alleged that Greene and Sanders were "additionally on notice of the potential liability" as of the dates when the union first filed unfair labor practice charges and when the Board issued its first complaint. J.A. 235b. At oral argument, Board counsel stated that, the "General Counsel . . . typically "leave[s] in [its] compliance allegations . . . three variations of points of notice -- [unfair labor practice] conduct, the charge, the complaint -- . . . because there [are] Board decisions that have found [notice] at various different points." Oral Arg. Recording 34:17-34:39.

B

We turn next to the Board's determination that "the process of closing down (and the attendant distribution of assets to shareholders) began before" the union filed unfair labor practice charges on May 24, 1999. 345 NLRB No. 22, at 3.

As the use of the word "attendant" suggests, the principal justification for the Board's determination that the decision to close the company was made before May 1999 is its assumption that the decision preceded the distributions, which began in mid-February. *See also id.* at 4 ("[T]he decision to close, *which triggered the distributions*, took place long before any unfair labor practice charges were filed . . . ." (emphasis added)). But the Board cited no evidence to support this assumption, other than the fact of the distributions themselves. This amounts to little more than assuming the conclusion, since the question at issue is whether the owners made the distributions incident to a bona fide decision to close the company, or instead as a strategy for evading the company's liability to its employees.

Nor have we been able to find any documentary evidence that the owners made a decision to close the company before they began distributing its assets.[3] There are no documents characterizing the distributions as part of a wind-down. Indeed, the first document reflecting a decision to close is a bill from A.J. Mechanical's law firm that lists a fee for a July 1999 discussion with Greene about "sale terms and dissolution of corporation." J.A. 720. All the other relevant documents --

---

[3] Greene did testify at the compliance hearing that the decision to close the company was made in late 1998. *See* J.A. 301. But the ALJ expressly discredited that testimony, *see* 345 NLRB No. 22, at 9, and the Board found "no basis for reversing" the ALJ's credibility determinations, *id.* at 1 n.1.

auction notices, *id.* at 567, 575, state filings, *id.* at 563, 714, and a corporate resolution, *id.* at 559 -- are dated even later than July.

The Board also asserted that "[e]arly in 1999, the [company] ceased pursuing new work and decided to complete only projects already underway." 345 NLRB No. 22, at 3. Once again, the Board cited no evidence to support that proposition, and we have found none that does. In its brief, Board counsel offered four citations to support the assertion that the company ceased pursuing new work "[i]n early 1999." Resp. Br. 10. Two of those citations are to testimony by Greene, who was discredited by the ALJ and the Board. The other two are to statements by Greene's co-owner, Sanders. Although Sanders was not discredited, he did not say that the company stopped pursuing new work in early 1999. *See* J.A. 615-16 (stating that the decision to close the company was made long before December 1999, but not specifying when); *id.* at 618-19 (explaining that his health problems played a part in his decision to close the company, without stating when that was).

More important, the Board's opinion failed to take account of significant record evidence that is contrary to its conclusion that the company decided to close before it began distributing funds on February 16, 1999. One piece of evidence is the statement of Sue Crochet, an NLRB field examiner, who testified at the compliance hearing. Crochet testified that Greene had told her, on April 21, 1999, that he did not want an election and intended to "fight to the bitter end." According to Crochet, Greene said "that he *could* move the job, that the job was portable, that he didn't need any union people[, and] that he *could* shut down the business or sell it." J.A. 329 (emphasis added). These statements suggest that, as of April 1999, Greene had not yet decided that he *would* close the company.

The most significant evidence is Greene's own testimony in response to questions at a May 6, 1999 representation hearing. In that testimony, Greene could not have been more emphatic in insisting that the company was *not* going out of business:

> Q: Are you going out of business?
> A: No, I'm not going out of business.
> . . .
> Q: And you're looking for new work. You want to stay here and continue to do new work. Correct?
> A: I'm going to stay in business.
> . . .
> Q: And you haven't gone out and told people, We're out of business; we're no longer accepting work; we don't want to know about bids that are coming in. You haven't done that. Correct?
> A: I'd be foolish to do that.
> Q: Of course not, because you want more work. Right?
> A: Yes.
> . . .
> Q: And you are taking steps consistent with your desire to have more work. Right? You're letting people know you're in this business to do the work.
> A: Yes.
> . . .
> Q: [A]nd it is your plan to continue to bid on other jobs in the future. Correct? Isn't that your objective, to stay in business?
> A: Today it is. Yes.

J.A. 111-20. The record thus contains Greene's clear admission that he had not decided to close the business (and was still pursuing new work) as late as May 6, months after he and Sanders began distributing cash to themselves. This directly

contradicts the Board's finding that the decision to close was made before the distributions began. Indeed, it suggests that the decision was not made before the union filed formal unfair labor practice charges on May 24, just eighteen days after Greene testified, as there is no indication that the co-owners made any decision about dissolution during that interval.

The Board's opinion offered no explanation at all for rejecting this contrary evidence. In its appellate brief, Board counsel suggested that the Board may have disregarded Greene's statements in light of "the administrative law judge's determination . . . to discredit Greene's testimony, 'except that which other, credited evidence corroborates.'" Resp. Br. 30-31. But this quotation omits the balance of the quoted sentence. The ALJ's full statement was: "I shall not credit any of his testimony, except that which other, credited evidence corroborates *or that which constitutes an admission against interest*." 345 NLRB No. 22, at 9 (emphasis added). Greene's testimony that he had not decided to close the business in May 1999, months after the distributions began, is such an admission.[4]

In sum, the Board's opinion failed to identify evidence sufficient to support its finding that the company had decided to shut down before it began distributing cash to its owners, and likewise failed to explain why it rejected evidence that is contrary to that finding. Those failures require us to set aside

---

[4]At oral argument, Board counsel tried another tack, suggesting that Greene's statements at the May 1999 hearing were "not against his interest" because the date of the decision to close "was not at issue" at that hearing. Oral Arg. Recording 23:02-23:13. But there is nothing in the decision of either the Board or the ALJ suggesting this meaning of "admission against interest," and nothing in the Board's decision explaining why it disregarded the May testimony.

the Board's decision.  *See, e.g.*, *Lakeland Bus Lines*, 347 F.3d at 961-64; *Pendergrass*, 878 F.2d at 392-96.

## III

The NLRB held that William Greene and his company committed egregious violations of the labor laws, and it adopted the ALJ's determination that Greene's testimony was unworthy of belief.  Nonetheless, the Board accepted Greene's contentions that he was unaware his conduct could subject his company to monetary liability until the union filed formal charges, and that he distributed all of the company's assets pursuant to a bona fide decision to close the business made long before those charges were filed.  Based on those two findings, the Board refused to pierce the corporate veil and hold the Greenes personally liable for the backpay order that it had issued against the by-then defunct company.  The Board failed to cite evidence sufficient to support those findings and failed to explain why it disregarded evidence that contradicts them.  We therefore grant the union's petition for review, vacate the Board's refusal to pierce the veil, and remand for further proceedings.  At the same time, we grant the Board's cross-application for enforcement against A.J. Mechanical.

*So ordered*.