# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 11, 2007            Decided June 15, 2007

No. 06-1089

E.I. DU PONT DE NEMOURS AND COMPANY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND
SERVICE WORKERS INTERNATIONAL UNION, ET AL.
INTERVENORS

———

Consolidated with
06-1163, 06-1168

———

On Petitions for Review and Cross-Application for
Enforcement of an Order of the
National Labor Relations Board

———

*Steven W. Suflas* argued the cause for petitioner E.I. du Pont
de Nemours and Company. With him on the briefs were
*Jennifer L. Sova* and *James D. Donathen*.

*James B. Coppess* argued the cause for petitioners United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, et al. On the brief was *Daniel M. Kovalik*. *Peter Herman* entered an appearance.

*Philip A. Hostak*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *David S. Habenstreit*, Supervisory Attorney.

*Steven W. Suflas*, *Jennifer L. Sova*, and *James D. Donathen* were on the brief for intervenor E.I. du Pont de Nemours and Company.

*Daniel M. Kovalik* was on the brief for intervenors United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, et al.

Before: SENTELLE, GARLAND and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: This case arises out of negotiations between E.I. du Pont de Nemours and Company and the Union that represents employees at one of the Company's factories in New York. In 2001, the Company declared impasses with respect to two sets of negotiations, one concerning the subcontracting of certain positions and one concerning the parties' overall collective bargaining agreement. The National Labor Relations Board determined that the Company had permissibly declared an impasse with respect to

the overall collective bargaining agreement but had wrongfully declared an impasse with respect to the subcontracting negotiations. Both the Company and the Union filed petitions for review in this Court. The Union contends that the Company impermissibly bifurcated the subcontracting issue and the overall collective bargaining agreement issues into two separate sets of negotiations, and that because the subcontracting impasse was unlawful, so too the collective bargaining agreement impasse was unlawful. The Company argues, contrary to the conclusion of the Board, that there was a lawful impasse on the subcontracting issue. For the reasons set forth below, we deny the petitions for review and grant the Board's cross-petition for enforcement.

I

1. At its facility in Tonawanda, New York, E.I. du Pont de Nemours and Company manufactures Corian "shapes." Corian is a "solid surface" material used to make countertops in kitchens and other areas. At the Tonawanda facility, liquid Corian is poured into molds in the shapes of bowls and sinks. Employees called "millers" then remove the outer layer from the shapes and drill drain holes. After that, employees called "finishers" sand the shapes to smooth them out and remove blemishes. Along with the rest of the employees at the Tonawanda facility (approximately 400 in all), these millers and finishers are represented by the Union.

In 1977, the Company and the Union signed a collective bargaining agreement.[*] The CBA included an "evergreen" clause, which permitted either party to terminate or propose alterations to the agreement at any time. Sixteen years later, in 1993, the Company invoked that clause and notified the Union that it intended to terminate the CBA and negotiate a new agreement. After a year of unfruitful negotiations over a new CBA, the Company declared an impasse in 1994 and implemented its final offer.

Two features of that final offer are relevant to this case. First, the Company eliminated "pyramiding," an overtime pay system in which employees are compensated at the overtime rate both for hours worked per day in excess of eight hours and for hours worked per week in excess of 40 hours. Second, the Company eliminated most available healthcare plans and implemented a cost-sharing formula to gradually equalize Company and employee contributions to healthcare costs.

In response to the Company's implementation of its final offer, the Union filed unfair labor practice charges with the NLRB. In 1997, however, the Company and the Union entered into a settlement agreement, in which the Company agreed to restore pyramiding and freeze healthcare cost-sharing at the ratio that existed as of 1996. The parties resumed negotiations over a new CBA in 1998.

---

[*] The employees at the Tonawanda facility were represented by the Buffalo Yerkes Union until 1999. At that point, the Buffalo Yerkes Union affiliated with the Paper, Allied Industrial, Chemical and Energy Workers International Union, the predecessor to the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, one of the petitioners in this case. For ease of reference, we refer simply to "the Union."

Meanwhile, in 1995, after the Company declared the impasse on the CBA negotiations but before the parties reached the settlement agreement, the parties began a separate set of negotiations concerning the discrete issue of finishing work (the sanding of Corian shapes performed by finishers). Since 1985, the Company had subcontracted finishing work off premises. The Company announced in early 1995, however, that it intended to bring finishing work back in-house. In August of that year, the parties reached an agreement – even though negotiations on the overall CBA were at that time stalled – in which the Company promised to keep 85% of finishing work in-house and the Union accepted a lower wage requirement for finishing work. That agreement was called the "CCMC finisher agreement."

To summarize, by 1997 the Company and the Union had entered into two agreements relevant to this case. The first was a settlement agreement that preserved negotiations over the overall CBA by restoring pyramiding and freezing the ratio of healthcare cost-sharing at the 1996 level. The second was the CCMC finisher agreement, which related to the discrete issue of bringing finishing work in-house.

2. From 1998 to 2001, the parties continued to bargain over a new CBA. In January 2001, the Company presented the Union with another final offer in the CBA negotiations. That final offer, like the one in 1994, would have eliminated pyramiding and resumed the gradual phase-in of healthcare cost-sharing. At the same time, the Company proposed a "Supplemental Agreement" that amended the CCMC finisher agreement. That amendment would have committed the Company to gradually raising the wages of finishers but would have eliminated the requirement that the Company keep a minimum percentage of finishing work in-house.

In February 2001, the Company changed course and informed the Union that it would terminate the CCMC finisher agreement in June of that year. The Company told the Union that emerging technologies would soon make it possible to completely eliminate all finishing positions, as well as milling positions. In response to this, the Union presented a "helping hands" proposal that would purportedly have alleviated some of the bottleneck problems at the factory, but the Company rejected it. The Company also insisted that negotiations over the CCMC finisher agreement be kept separate from negotiations over the CBA.

In April 2001, the Company informed the Union that it had conducted a feasibility study; the study demonstrated that the Company could save $1 million per year by subcontracting finishing and milling work. As a result, the Company would subcontract all of the finishing and milling work by May 1 unless the Union submitted a plan with comparable cost savings. Throughout April, the Union submitted information requests to the Company concerning the basis for the $1 million cost-savings figure, most of which the Company complied with.

On April 12, the Company declared an impasse on the CBA negotiations and implemented its final offer eliminating pyramiding and gradually equalizing healthcare cost-sharing. Then, on May 1, the Company declared an impasse on the subcontracting negotiations and began to subcontract finishing and milling work.

3. Before the NLRB, the Union challenged the legality of the two impasses under Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act. *See* 29 U.S.C. § 158(a)(1), (5). In February 2006, the Board ruled (as relevant here): (1) the Company had wrongfully failed to provide information in response to seven specific requests by the Union on April 23,

2001, and this failure rendered the impasse on the subcontracting issue unlawful; (2) the Company had not violated the duty to bargain in good faith by insisting on separate negotiations over the subcontracting issue and the CBA; and (3) the Company's implementation after impasse of its plan to gradually equalize healthcare costs did not confer upon the Company such open-ended discretion as to be unlawful. *See E.I. du Pont de Nemours & Co.*, 346 NLRB No. 55, at 4-9 (2006) ("Decision and Order"). Board Member Liebman dissented from the latter two conclusions. *See id.* at 10-12.

The Company and the Union filed timely petitions for review in this Court, with the Company challenging the Board's first holding and the Union challenging the other two holdings. The Board filed a cross-petition for enforcement. We must uphold the Board's decisions if its factual findings are supported by substantial evidence and the decisions are not arbitrary and capricious. *Carpenters & Millwrights, Local Union 2471 v. NLRB*, 481 F.3d 804, 808-09 (D.C. Cir. 2007). Among other circumstances, the Board acts arbitrarily when it departs from its own precedent without a reasonable explanation. *See Jochims v. NLRB*, 480 F.3d 1161, 1167 (D.C. Cir. 2007).

II

1. The Company argues that its refusal to provide the Union with information in response to seven specific requests did not preclude a lawful impasse on the subcontracting issue, contrary to the Board's decision. In the Company's view, NLRB precedent requires the Board to find a "causal connection" between the refused information requests and the impasse – beyond the fact that the information requests were relevant to the central issues on the table – such as specific evidence that the Union would have formed a counterproposal had the Company granted the information requests. Therefore,

the Company argues, the Board unreasonably departed from its own precedent by declaring the impasse invalid.

The Company's objection to the Board's decision is wrong both factually and legally.

As a factual matter, the Board clearly *did* find some causal connection between the denied information requests and the impasse. The Board explained that "[i]n order to assess the accuracy of the [Company's] claims [about cost savings], it was necessary for the Union to examine the data that formed the basis for the [Company's] conclusions." Decision and Order at 5-6. The Board found that at least one request was both "relevant and essential to the Union's ability to assess the [Company's] assertion that [certain] costs constituted 40 percent of its labor costs." *Id.* at 6. As to the other six requests, the ALJ determined that they were "necessary and relevant in order for the Union to either assess, or understand, the feasibility study, or formulate its own proposals," and the Board adopted this finding. *E.I. du Pont de Nemours & Co.*, JD-138-03, at 22, 2003 WL 23109100 (2003); Decision and Order at 1. In short, there is no merit to the Company's claim that the Board did not find a causal link between the information requests and the impasse.

As a legal matter, although the Board has consistently suggested the necessity for some causal connection between an unfair labor practice and an interruption in bargaining before declaring impasse, the Board has never required the establishment of "but for" causation in absolute terms. The Board has, however, repeatedly reiterated the principle that "a finding of valid impasse is precluded where the employer has failed to supply requested information *relevant to the core issues separating the parties*." *Caldwell Mfg. Co.*, 346 N.L.R.B. No. 100, at 12 (2006) (emphasis added); *see also Titan Tire Corp.*, 333 N.L.R.B. 1156, 1159 fn. 11 (2001); *U.S. Testing Co.*, 324

N.L.R.B. 854, 860 (1997). As the Board has explained, "[a] legally recognized impasse cannot exist where the employer has failed to satisfy its statutory obligation to provide information needed by the bargaining agent to engage in meaningful negotiations." *Decker Coal Co.*, 301 N.L.R.B. 729, 740 (1991); *see also Roytype Div., Pertec Computer Corp.*, 284 N.L.R.B. 810, 812 (1987). And this Court, in a case in which an employer refused to provide relevant information, held that the employer's "unlawful refusal to supply the requested [information] preclude[s] the Company from declaring an impasse." *U.S. Testing Co., Inc. v. NLRB*, 160 F.3d 14, 20, 22 (D.C. Cir. 1998); *accord Raven Servs. Corp. v. NLRB*, 315 F.3d 499, 505 (5th Cir. 2002); *Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181, 188-89 (2d Cir. 1991); *Cone Mills Corp. v. NLRB*, 413 F.2d 445, 449-50 (4th Cir. 1969).

The Company points to *Alwin Manufacturing Co. v. NLRB*, 192 F.3d 133 (D.C. Cir. 1999). In that case, an employer had unilaterally imposed new production standards and a new vacation policy during negotiations, both of which the Board later determined to be unfair labor practices. *Id.* at 135. The Board further found that those practices had contributed to the impasse and therefore ruled that the impasse was invalid. *Id.* at 135, 137. Before this Court, the employer argued that the Board had applied an impermissible *per se* rule that any unfair labor practice committed during negotiations necessarily precluded a lawful impasse. *Id.* at 138. This Court agreed with the employer that a *per se* rule would be inappropriate but found that the Board had demonstrated "a causal connection between the unilateral changes and the failure to reach an agreement." *Id.* Thus, *Alwin Manufacturing* stands for the unremarkable proposition that an employer's commission of an unfair labor practice during negotiations does not necessarily preclude a lawful impasse and that the demonstration of a "causal connection" is important to a decision invalidating an impasse.

That general principle says nothing about the legal effect of a specific unfair labor practice central to the negotiation process: the withholding of information relevant to the issues on the bargaining table.

Likewise, in *Sierra Bullets*, the Board considered the "precise issue" of "whether the mere existence of any information request, *regardless of its relevance to the core issues* that separate the parties at the bargaining table, precludes a finding of impasse." 340 N.L.R.B. 242, 244 (2003) (emphasis added). The Board found that because the requested information in that case was *irrelevant*, there was "no convincing argument that [providing the information] would have changed the fact that the parties were deadlocked." *Id*. The key principle of *Sierra Bullets* was relevance; the decision didn't suggest that any broader causal nexus is required when an employer fails to provide *relevant* information. To the contrary, the clear implication of *Sierra Bullets* is that denial of an information request relevant to core bargaining issues precludes a lawful impasse. *See Caldwell Mfg. Co.*, 346 N.L.R.B. No. 100, at 12-13.

In sum, Board and court precedents reflect the principle that a denial of "information relevant to the core issues separating the parties" can preclude a lawful impasse, and such a commonsense principle is certainly reasonable. In this case, moreover, the Board expressly and repeatedly stated that it believed that the Union's seven information requests were "necessary" and "essential" to the bargaining over the subcontracting issue. We therefore reject the Company's "causal connection" challenge.

2. The Company also argues that the information requests by the Union do not meet the standard of relevance established by the Board. In the Company's view, "any discrepancies

between the information provided and that later demanded by the Union in the seven requests at issue are so small" that the Union had "an adequate basis to evaluate [the Company's] claims." Company Pet'r's Br. at 54.

The Board's relevance standard is "a liberal discovery-type standard, under which the requested information need only be relevant to the union in its negotiations." *U.S. Testing Co.*, 160 F.3d at 19. As this Court has stated, "in the absence of a countervailing interest [such as confidentiality concerns], any requested information that has a bearing on the bargaining process must be disclosed." *Id.*

The thrust of the Board's relevance finding in this case was that the Company provided the Union with only "generalized or bundled figures" to support its $1 million cost-saving assertions and therefore the Union properly requested the hard data that the Company used to arrive at its figures. Decision and Order at 5. In the Board's judgment, "it was necessary for the Union to examine the data that formed the basis for the [Company's] conclusions." *Id.* at 5-6. For example, to respond to the Company's claim that 40% of its labor costs were attributable to employee benefits, the Union requested the cost data for benefits of finishing and milling employees. *See id.* at 6. Similarly, the Union requested information on the number of Corian bowls of each style and color finished in-house versus off-site in order to determine whether the Company had purposefully been manufacturing the most labor-intensive kinds of bowls in-house in order to skew upward the in-house costs. *See id.*

The Board's relevance finding here was a reasonable application of the well-established NLRB principle that a union is entitled to inspect the data relied on by an employer and does not have to accept the employer's bald assertions or generalized figures at face value. *See, e.g.*, *Republic Die & Tool Co.*, 343

N.L.R.B. 683, 686-87 (2004) (financial information); *Ormet Aluminum Mill Prods. Corp.*, 335 N.L.R.B. 788, 802 (2001) (purchasing information); *Merchant Fast Motor Lines, Inc.*, 324 N.L.R.B. 562, 563 (1997) (financial information); *McGuire Steel Erection, Inc.*, 324 N.L.R.B. 221, 222-24 (1997) (payroll records); *cf. NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 152-53 (1956) ("If . . . an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy."). The Company has advanced no persuasive reason for this Court to disturb the Board's reasonable conclusion.

3. Before this Court, the Company also suggests that the Board's remedy in this case – an order to reinstate the finishing and milling employees – imposes an "undue burden." *See Vico Prods. Co. v. NLRB*, 333 F.3d 198, 212 (D.C. Cir. 2003); *O'Dovero v. NLRB*, 193 F.3d 532, 538 (D.C. Cir. 1999). The Board responds that it has reserved that issue for a future compliance proceeding and therefore that judicial review of the question is inappropriate at this time. *See* Decision and Order at 6 n.10. We agree. As we have explained, "[t]he first and only opportunity for [the Court to vacate a Board-imposed remedy] is ordinarily in a petition for review of the Board order imposing the remedy but, if the Board reserves the issue for later consideration, that opportunity will necessarily be deferred until the Board resolves the issue in a subsequent order." *Scepter, Inc. v. NLRB*, 448 F.3d 388, 391 (D.C. Cir. 2006); *see also Great Lakes Chem. Corp. v. NLRB*, 967 F.2d 624, 629-30 (D.C. Cir. 1992).

## III

1. In its petition for review, the Union argues that the Board unreasonably approved the Company's separation of the subcontracting negotiations from the overall CBA negotiations.

In the Union's view, the impasse in the CBA negotiations could have been averted had the Union been able to bargain over the CBA issues and the subcontracting issue together.

As a general matter, with respect to mandatory subjects of bargaining, a party has the right to insist on negotiating an entire contract rather than engaging in piecemeal negotiation over particular issues. As the Board has stated, it "is well settled that the statutory purpose of requiring good-faith bargaining would be frustrated if parties were permitted, or indeed required, to engage in piecemeal bargaining." *E.I. Dupont de Nemours & Co. (Spruance)*, 304 N.L.R.B. 792, 792 n.1 (1991); *see Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 735 (D.C. Cir. 2000); *Trumball Mem'l Hosp.*, 288 N.L.R.B. 1429, 1446-47 (1988); *see also Duffy Tool & Stamping, LLC v. NLRB*, 233 F.3d 995, 997-99 (7th Cir. 2000); *Visiting Nurse Servs., Inc. v. NLRB*, 177 F.3d 52, 59 (1st Cir. 1999). In this case, however, the Board reasonably concluded that the Company did not violate its duty to bargain in good faith because the parties had a long and firmly established history of bargaining over issues related to the milling and finishing operation separately from those issues relating to the CBA.

The Union contends that this case is indistinguishable from a previous case involving the same company. In *Spruance*, as in this case, the Company insisted that negotiations on two specific issues take place separately from negotiations on an overall collective bargaining agreement. 304 N.L.R.B. at 802. The Board found in that case that "management, by this course of conduct, had . . . unreasonably reduced the flexibility of collective bargaining and narrowed the range of possible compromises." *Id.* It was clear in *Spruance* that the employer had purposefully bifurcated the negotiations in order to avoid "horse trade" offers and accelerate impasse and implementation. *Id.* The Union posits that the same thing happened in this case:

The Company segregated negotiations in order to avoid protracted negotiations and more quickly implement its proposals.

We conclude that the Board reasonably distinguished its precedent in *Spruance*. In that case, the parties did not have a history of separate bargaining over the two issues. On the contrary, the employer negotiated with the union over those proposals at the same sessions where the CBA was discussed, *see id.* at 793, and, far from accepting bifurcation, the union insisted that the proposals were part of the CBA negotiations, *see id.* at 794. In this case, by contrast, there was a long history of separate negotiations between the Company and the Union with respect to the subcontracting issue (as well as other discrete issues). Here, the CBA's "evergreen" clause permitted the parties to negotiate components of the contract while the balance of the contract's terms remained in effect. As the Board found, "[t]he parties utilized this clause throughout the life of the contract, negotiating and implementing new terms in discrete areas, such as bonuses, wage increases, and health benefits." Decision and Order at 4. Of specific relevance to this case, "the issue of subcontracting the milling and finishing work . . . was historically separate" from "general bargaining [and] was not even in the unit, i.e., it was subcontracted, for about 10 years." *Id.* After all, the original CCMC finisher agreement was "proposed, negotiated, and implemented separate and apart from the rest of the contract" – during a period when overall CBA negotiations were stalled. *Id.* Additionally, the CCMC finisher agreement included its own, separate termination clause. Whereas the CBA could be terminated upon notice by either party 60 days prior to its expiration date, the CCMC finisher agreement could not be terminated unless a party gave 120 days notice. Furthermore, there were different committees to bargain over the two sets of issues: a "contract committee" negotiated

CBA issues, while issues related to the CCMC finisher agreement were discussed by the "executive board."

Moreover, not only did the Union not insist on unified bargaining, since "1995, i.e., at the very inception of the in-house milling and finishing work, the parties . . . willingly bargained separately for that operation." *Id.* And while "the Union subsequently made a proposal to retain" the milling and finishing operation, "it never protested on the ground that the negotiations were separate." *Id.* The Board's finding that "the issue of subcontracting the milling and finishing work . . . was historically separate" from "general bargaining," *id.*, was supported by substantial evidence. In light of that history, its determination that the present case fell outside of its general rule against bifurcated negotiations was reasonable.

The Board concluded that this history of separation demonstrates that the Company did not insist on bifurcated negotiations in order to distort the bargaining process; the Company simply adhered to the parties' longstanding practice of separate negotiations. The Board's judgment was reasonable. Whether a party has bargained in good faith is assessed by looking to the totality of the circumstances. *See NLRB v. Cauthorne*, 691 F.2d 1023, 1026 n.5 (D.C. Cir. 1982). As the Board has stated, "good faith or the lack of it depends upon a factual determination based on overall conduct." *In re Matanuska Elec. Ass'n, Inc.*, 337 N.L.R.B. 680, 681 (2002) (internal quotation marks omitted). In this case, it was reasonable for the Board to look to the parties' long history of bargaining separately on these issues (even to the point where stalled negotiations on the CBA did not prevent the formation of the CCMC finisher agreement in 1995).

2. According to the Union, had it been given more time and information to formulate a cost-saving plan in response to the

Company's feasability study on subcontracting, the Union could have prevented the impasse in the CBA negotiations by coming up with a "horse trade" linking the two sets of issues. In light of our holding that the Board reasonably found that bifurcation was lawful, however, we reject this argument. The Company permissibly kept the two sets of negotiations separate, and therefore the Company could properly declare a lawful impasse in the CBA negotiations even though it could not declare a lawful impasse in the subcontracting negotiations.

3. Finally, the Union argues that, even assuming a valid impasse existed, the Company's implementation of its healthcare cost-sharing proposal was improper. As a general matter, a lawful impasse entitles an employer to implement the "last, best offer" it presented in negotiations. *Detroit Typographical Union No. 18 v. NLRB*, 216 F.3d 109, 117-18 (D.C. Cir. 2000)*; see also TruServ Corp. v. NLRB*, 254 F.3d 1105, 1114 & n.8 (D.C. Cir. 2001); *Noel Foods, a Div. of Noel Corp. v. NLRB*, 82 F.3d 1113, 1120 (D.C. Cir. 1996). The Board, however, has carved out a narrow exception to that general rule: An employer may not unilaterally implement a proposal that gives the employer standardless discretion over future changes with respect to mandatory subjects of bargaining, such as pay and benefits. *See McClatchy Newspapers, Inc.*, 321 N.L.R.B. 1386, 1390-91 (1996); *KSM Indus., Inc.*, 336 N.L.R.B. 133, 134-35 (2001), *modified in part*, 337 N.L.R.B. 987 (2002); *see also Detroit Typographical Union*, 216 F.3d at 117-18. The rationale for that exception is that such discretion would render future bargaining impossible because the Union could not know what criteria the employer was using to formulate its proposals. *Detroit Typographical Union*, 216 F.3d at 117; *McClatchy Newspapers, Inc. v. NLRB*, 131 F.3d 1026, 1032 (D.C. Cir. 1997); *accord The Edward S. Quick Co. v. NLRB,* 241 F.3d 41, 43 (1st Cir. 2001) ("[A]llowing a succession of unilateral changes by the employer . . . would make a union seem impotent

to its members over time and further undermine the union's bargaining ability by creating uncertainty about prevailing terms.").

The Union contends in particular that a provision in the new healthcare plan gives the Company too much discretion in making future changes to employees' healthcare plans. That provision states: "Participants will pay for premiums, co-pays, co-insurance and deductibles established for a particular plan year. . . . Projected increases for future plan years will be shared equally between Du Pont and participants, provided, however, such increases may be allocated to premiums, components of plan design, or any combination thereof." Therefore, the Company and the employees must share any future increase in healthcare costs equally, but the Company has discretion to allocate those costs among premiums and other components of the healthcare plan as the Company sees fit. The Union seizes on this comparatively small measure of employer discretion, claiming that it violates the *McClatchy Newspapers* principle and that therefore the Board has unreasonably departed from its own precedent by upholding the Company's implementation of the healthcare proposal.

We disagree with the Union because the Board reasonably distinguished this case from its precedents. The Board explained that in prior cases where the Board invalidated employer implementations after impasse, the employer had implemented a "broad discretionary provision." Decision and Order at 8. For example, in *McClatchy Newspapers*, the employer had implemented a "merit pay" clause that gave it unlimited discretion to decide all future pay increases. *Id.* (citing *McClatchy Newspapers*, 321 N.L.R.B. at 1391). Similarly, in *KSM Industries*, the employer had reserved for itself broad discretion over such fundamental healthcare plan elements as the overall level of benefits – not just over which

specific components of a plan might be subject to future cost increases. *See id.* (citing *KSM Indus.*, 335 N.L.R.B. at 135). By contrast, the Board explained, in this case the Company implemented "a narrow, specific clause that, by its terms, sets limits on the [Company's] discretion to act." *Id.* The Company's proposal specifically defines how future cost increases will be shared and thus does not give the Company "unfettered discretion to act." *Id.*

In *Detroit Typographical Union*, where we held that the Board had unreasonably applied *McClatchy Newspapers* to preclude an employer from implementing a wage proposal, we made clear that even "a good deal of [employer] discretion" is insufficient to invalidate an employer's implementation of a proposal after impasse. 216 F.3d at 118. In that case, the employer's plan had specified the average annual increase in employee pay going forward, but had retained substantial discretion for the employer to determine whether individual employees should receive a raise. *Id.* The current case is more analogous to *Detroit Typographical Union* than to *McClatchy Newspapers* or *KSM Industries*. The Company's plan broadly cabins its discretion over healthcare costs by requiring a fixed cost-sharing ratio for all future increases, just as the plan in *Detroit Typographical* broadly set targets for future pay increases. The Company's limited discretion to allocate increases among the various elements of the healthcare plan does not set this proposal within the narrow *McClatchy Newspapers* exception any more than the employer's discretion over individual merit pay determinations did so in *Detroit Typographical Union* – or so the Board could reasonably conclude.

19

* * *

We deny the petitions for review and grant the Board's cross-petition for enforcement.

*So ordered.*