# United States Court of Appeals
## For the First Circuit

No. 08-1878

NORTHEASTERN LAND SERVICES, LTD.
d/b/a THE NLS GROUP,

Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner.

ON PETITION FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Richard D. Wayne with whom Hinckley, Allen & Snyder LLP was on brief for petitioner.
Ruth E. Burdick, Attorney, with whom Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Meredith Jason, Supervising Attorney, and Milakshmi V. Rajapakse, National Labor Relations Board, were on brief for respondent.

March 13, 2009

**LYNCH**, **Chief Judge**.  This case provides a cautionary tale for employers about the risk of maintaining and enforcing a broad confidentiality clause.  Northeastern Land Services, Ltd. ("NLS") petitions for review of the National Labor Relations Board's finding that it violated section 8(a)(1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), by maintaining an overbroad confidentiality provision and by discharging its employee Jamison Dupuy for violating it.  Ne. Land Servs., Ltd., 352 N.L.R.B. No. 89, 2008-2009 NLRB Dec. (CCH) ¶ 15,110 (June 27, 2008).  The Board has filed a cross-application to enforce the order.

The case also raises an issue of first impression: whether a two-member Board decision complied with the quorum requirement of section 3(b) of the NLRA.  We deny the petition and grant the Board's cross-application for enforcement.

I.

Because "the Board is primarily responsible for developing and applying a coherent national labor policy, we accord its decisions considerable deference."  NLRB v. Boston Dist. Council of Carpenters, 80 F.3d 662, 665 (1st Cir. 1996) (citation omitted).  The Board's judgment stands when the choice is "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488

(1951). A Board order must be enforced if the Board correctly applied the law and if its factual findings are supported by substantial evidence on the record. 29 U.S.C. § 160(e), (f); Yesterday's Children, Inc. v. NLRB, 115 F.3d 36, 44 (1st Cir. 1997). Where, as here, "the board has reached a conclusion opposite of that of the ALJ, our review is slightly less deferential than it would be otherwise." C.E.K. Indus. Mech. Contractors, Inc. v. NLRB, 921 F.2d 350, 355 (1st Cir. 1990).

## II.

The facts are not in dispute. NLS is a temporary employment agency located in East Providence, Rhode Island which supplies workers to clients in the natural gas and telecommunications industries, but pays its workers directly. Dupuy was employed twice by NLS as a right-of-way agent for the acquisition of land rights by clients, from February to November 2000, and from July to October 2001. Dupuy obtained the 2001 placement by contacting Rick Lopez, a project manager for NLS client El Paso Energy, who had once worked with Dupuy at NLS. Lopez directed Dupuy to contact NLS, which soon placed him with El Paso at its Dracut Expansion Project in Massachusetts.

Before both of Dupuy's placements by NLS, NLS required Dupuy to sign a temporary employment contract which said, in relevant part:

> Employee . . . understands that the terms of
> this employment, including compensation, are

-3-

> confidential to Employee and the NLS Group.
> Disclosure of these terms to other parties may
> constitute grounds for dismissal.

This confidentiality provision is at the heart of this case.

Dupuy complained to NLS about repeated delays in receiving his paycheck. He was particularly concerned because he had to pay for expenses such as his hotel bills up front and later seek reimbursement. After Dupuy tried to negotiate with NLS, and even threatened to quit, Jesse Green, Executive Vice President and Chief Operating Officer of NLS, agreed to call Lopez to see if El Paso would either pay for Dupuy's hotel bill or provide a larger per diem than NLS had offered to help with Dupuy's cash flow problems. Although NLS ultimately billed most of Dupuy's expenses to El Paso, NLS was responsible for reimbursing Dupuy. Green told Dupuy that Lopez would not agree to any alternative arrangements.

In early October 2001, Dupuy raised two additional concerns about his job. The first arose when Dupuy contacted Lopez to tell him that Dupuy's cell phone was not working. Dupuy asked Lopez whether he might be able to work for El Paso through a different employment agency because Dupuy had not been paid in a timely manner by NLS. Lopez refused Dupuy's request and gave Dupuy the contact information of Norm Winters, an agent of NLS, to resolve the pay issues.

The second concern was the reimbursement for Dupuy's work-related use of his personal computer. Dupuy had initially

arranged to receive a $15-per-day reimbursement for computer usage. NLS treated this as a "pass-through" business expense for tax purposes, which did not count as income to the employee, and on which NLS did not pay Social Security taxes. On October 2, however, Dupuy received an email from NLS's coordinator of human resources, Susan Green, which referred to the computer usage reimbursement rate as $12 per day. Dupuy replied that El Paso had authorized, and he had been billing, $15 per day for computer usage; he questioned the $12-per-day rate. Green told Dupuy that NLS's accountants had determined that the computer usage cost should be considered taxable compensation, rather than a pass-through expense billed to El Paso. Green stated that the reclassification of the tax status of the computer usage fee had increased NLS's overhead costs, requiring an offsetting reduction of $3 per day.

Dupuy sent a reply email to Green, copying Lopez, stating, "By copy of this email to Rick Lopez, I am asking El Paso to offset your surcharge and additional tax burden." He said that if he did not receive the offset, "I will no longer be using my computer for this job. El Paso will have to furnish me with a digital camera, and I will no longer be available by email . . . . After today and until the matter has been resolved, my equipment is offline."

On the evening of October 3, he sent an email to everyone working with him on the El Paso project, including Rick Lopez, saying, "Until further notice, my computer is offline and I will not be accepting email. I can still be reached by the contact telephone numbers that you have." Dupuy did not copy any NLS managers on the email. Jesse Green testified that although he tried to contact Dupuy numerous times by paging him, calling his cell phone and leaving messages at his hotel and with other employees, Dupuy did not call him back.

On October 11, 2001, Jesse Green spoke with Dupuy on the phone. Green told Dupuy that NLS had tried to accommodate his requests, but that it seemed that NLS could never make Dupuy happy and, as a result, NLS thought it was best to terminate his employment. Dupuy replied that he would sue NLS for retaliatory discharge, alleging that it fired him because he had threatened to file a complaint against the company with the Massachusetts Attorney General alleging violations of state wage laws.[1] When Dupuy pressed Jesse Green for the reason for his termination, Green replied that NLS had cause to terminate Dupuy's employment, as Dupuy had "not lived up to [his] end of the bargain with [NLS]."

---

[1] The alleged violations were NLS's failure to pay Dupuy within six days of the end of the pay period and the deduction of $3.00 from his compensation due to the change in the rate of reimbursement for computer usage.

Jesse Green later testified that his statement regarding Dupuy's "failure to live up to his end of the bargain" was a reference to Dupuy's failure to comply with the confidentiality provision in the temporary employment agreement that required him not to disclose the terms of his employment to outside parties. Green, who had drafted the confidentiality provision, further testified that in making the determination that Dupuy had violated the confidentiality provision by contacting El Paso directly, Green thought it was "inappropriate" for Dupuy to "approach a client with [his] . . . problems [about salary], [because] then we're not providing the services that we contracted to provide."

Dupuy filed an unfair labor practice charge on October 24, 2001, and filed an amended charge on December 17, 2001. The complaint issued January 16, 2002, alleging that NLS violated section 8(a)(1) of the NLRA by maintaining and enforcing an unlawful confidentiality clause in its employment contract that discouraged employees from engaging in protected concerted activities, and by terminating Dupuy's employment on October 11 for violating the terms of that clause.

The ALJ found that although the provision did restrict the employees' right to discuss their terms and conditions of employment with third parties, "there are different gradations in how seriously employees' Section 7 rights are affected." Relying on his reading of Board precedent, the ALJ found that the

confidentiality provision did not violate section 8(a)(1), explaining that "because [NLS] did not prohibit discussions of terms and conditions of employment among fellow employees, I find [NLS's] restriction a less serious infringement upon its employees' Section 7 rights." Relying on language from Desert Palace Inc., 336 N.L.R.B. 271 (2001), the ALJ explained that "[i]t is necessary to strike a proper balance between employees' Section 7 rights and an employer's business justifications." Noting the competitive bidding process in NLS's industry, the ALJ found that NLS "had a legitimate and substantial business justification for the rule outweighing the restriction on the employees' Section 7 rights." Dupuy appealed.

On June 27, 2008, the Board, by a two-member panel, reversed the ALJ's decision, determining that, under Martin Luther Mem'l Home, Inc. (Lutheran Heritage), 343 N.L.R.B. 646 (2004), the confidentiality provision was unlawful because "employees reasonably would construe it to prohibit activity protected by Section 7." The Board explained, "The [confidentiality] provision, by its clear terms, precludes employees from discussing compensation and other terms of employment with 'other parties.' Employees would reasonably understand that language as prohibiting discussions of their compensation with union representatives." The Board determined that the provision was overbroad and therefore in

violation of section 8(a)(1), without relying on whether NLS had actually enforced the rule.

As to the termination of Dupuy's employment for violating the rule, the Board held, "Under extant Board precedent, an employer's imposition of discipline pursuant to an unlawfully overbroad . . . rule constitutes a violation of the Act." NLS had conceded that it dismissed Dupuy because he violated the confidentiality provision. The Board concluded that "[NLS]'s termination of Dupuy pursuant to [the confidentiality] provision violated Section 8(a)(1)." In a footnote to the unlawful discharge analysis, the Board explained that one member, Chairman Schaumber:

> [A]grees . . . that application of <u>Double Eagle Hotel & Casino</u> dictates a finding that Dupuy's termination violated Sec. 8(a)(1) of the Act. However, he questions the theory that an employer's imposition of discipline pursuant to an unlawfully overbroad rule is necessarily unlawful, such as in situations where the discipline imposed is for a lawful reason albeit under an overly broad, unlawful rule. Nonetheless, he applies precedent for institutional reasons for the purpose of deciding this case.

<u>Ne. Land Servs.</u>, 352 N.L.R.B. No. 89 at 3, n.9.

The Board ordered, inter alia, that NLS rescind the provision; that NLS notify its current and former employees under the temporary employment agreement of the decision; that Dupuy be reinstated to his former position or a substantially similar position; that Dupuy be made whole "for any loss of earnings and other benefits suffered as a result of the unlawful action taken

-9-

against him"; and that NLS ensure that the references to the unlawful discharge be deleted from NLS's files.

## III.

We turn to NLS's challenge to the Board's decision. NLS contends that the decision could not be properly issued because the Board lacked a quorum under section 3 of the NLRA, 29 U.S.C. § 153(b), in that it cannot delegate all of its powers to a two-person panel. On the merits, NLS argues that the Board erred in finding that the confidentiality agreement violated section 7 and in finding that Dupuy's termination violated the NLRA. These arguments fail.

A. The Quorum Requirement

The first issue raised is one of statutory interpretation of section 3(b). We owe some deference to the agency's view. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). By statute, the Board consists of five members, who are appointed by the President with the advice and consent of the Senate and serve staggered terms of five years. 29 U.S.C. § 153(a). Section 3(b) of the NLRA states:

> The Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise. . . . A vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board, and three members of the Board shall, at all times, constitute a quorum of the Board, except that two members shall constitute a quorum of any group designated pursuant to the first sentence hereof.

-10-

29 U.S.C. § 153(b).

Pursuant to that authority, the four members of the Board who held office on December 28, 2007 delegated the Board's powers to a three-member group. When the term of one member of that group expired three days later, a two-member quorum remained.[2]

The Board's delegation of its institutional power to a panel that ultimately consisted of a two-member quorum because of a vacancy was lawful under the plain text of section 3(b). First, section 3(b) allowed the Board to delegate all of its powers to a three-member group. Second, the statute states that "[a] vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board." The vacancy, which left the two-member quorum remaining, may not, under the terms of section 3(b), impair the right of the two-member quorum to exercise all powers of the Board. This is consistent with the conclusion of

---

[2]    The Board explained:
       Effective midnight December 28, 2007, Members Liebman, Schaumber, Kirsanow, and Walsh delegated to Members Liebman, Schaumber, and Kirsanow, as a three-member group, all of the Board's powers in anticipation of the expiration of the terms of Members Kirsanow and Walsh on December 31, 2007. Pursuant to this delegation, Chairman Schaumber and Member Liebman constitute a quorum of the three-member group. As a quorum, they have the authority to issue decisions and orders in unfair labor practice and representation cases. See Sec. 3(b) of the Act.
Ne. Land Servs., 352 N.L.R.B. No. 89 at 1 n.2

-11-

the Office of Legal Counsel of the U.S. Department of Justice which has concluded, "In our view, if the Board delegated all of its powers to a group of three members, that group could continue to issue decisions and orders as long as a quorum of two members remained." Quorum Requirements, Memorandum from M. Edward Whelan III, Principal Deputy Assistant Attorney Gen., Office of Legal Counsel, (Mar. 4, 2003), available at 2003 WL 24166831. Moreover, "[a]ny other general rule would impose an undue burden on the administrative process." R.R. Yardmasters of Am. v. Harris, 721 F.2d 1332, 1343 (D.C. Cir. 1983).

Our conclusion is consistent with that of another circuit. Photo-Sonics, Inc. v. NLRB, 678 F.2d 121 (9th Cir. 1982). In Photo-Sonics, a three-member panel of the Board heard the case, but before the Board announced its decision, one member of the panel submitted his resignation. The resignation became effective on the same day the decision in the case issued, although all three members concurred in the decision. The petitioner argued that the decision was unenforceable because "it was not made by a properly constituted three-member panel" because the resigning person, the petitioner argued, could not have participated in the decision. Id. at 122. Photo-Sonics reasoned that under section 3(b), "Even if [the member who resigned] did not participate [in the decision], a decision by two members of the panel would still be binding," id. at 122, and analogized the quorum requirement in section 3(b) to the quorum for the federal courts of appeals. Photo-Sonics stated,

-12-

"[c]ourts have interpreted 'quorum' to mean the 'number of the members of the court as may legally transact judicial business.'" Id. (quoting Tobin v. Ramey, 206 F.2d 505, 507 (5th Cir. 1953)). The court concluded that the participation of the two-member quorum needed to conduct business was sufficient. Id. at 123.

Further, courts have upheld analogous approaches by other administrative agencies. See Falcon Trading Group, Ltd. v. SEC, 102 F.3d 579, 582 (D.C. Cir. 1996) (upholding SEC's promulgation of a new quorum rule to allow it to continue to operate in the face of multiple vacancies); Hunter v. Nat'l Mediation Bd., 754 F.2d 1496, 1498-99 (9th Cir. 1985) (per curiam) (upholding decision by two members of three-member panel of National Mediation Board allowing two-member quorum where almost all of the preliminary work had been performed by one member); R.R. Yardmasters of Am., 721 F.2d at 1340 n.26 (upholding the National Mediation Board's delegation of its authority to a single member expected to remain in office).

B.      Overbreadth of the Confidentiality Provision

Section 8 of the NLRA prohibits employers from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in" section 7 of the NLRA. 29 U.S.C. § 158(a)(1). Section 7 guarantees employees the right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the

purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

Section 8(a)(1) has been read to bar employer interference with employees' right to discuss the terms and conditions of their employment with others under section 7 of the NLRA. See Beth Israel Hosp. v. NLRB, 437 U.S. 483, 491 (1978) ("[T]he right of employees to self-organize and bargain collectively established by § 7 . . . necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite."); Cent. Hardware Co. v. NLRB, 407 U.S. 539, 543 (1972) ("[O]rganization rights are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others.").

An employer violates section 8(a)(1) when it maintains a work rule that "would reasonably tend to chill employees in the exercise of their Section 7 rights." Lafayette Park Hotel, 326 N.L.R.B. 824, 825 (1998). Under the Board's caselaw, if the rule is "likely to have a chilling effect on Section 7 rights, the Board may conclude that [its] maintenance is an unfair labor practice, even absent evidence of enforcement." Id.; see also Guardsmark, LLC v. NLRB 475 F.3d 369, 374-80 (D.C. Cir. 2007) (explaining and applying Lafayette Park "mere maintenance" rule).

NLS contends that the confidentiality provision did not violate the NLRA because, as a factual matter, it did not prohibit

employees from discussing terms of employment among themselves and, although it was enforced, it was not enforced in the face of union activity.  NLS asserts that mere broad wording, without evidence of actual chilling of union activity, is insufficient to violate section 8(a)(1).

NLS then makes a qualitatively different argument: that the Board must engage in a balancing test.  Here, NLS contends the Board failed to consider the legitimate justification it had for the confidentiality provision: labor costs were a key component of its bids to clients, and NLS did not want its employees jeopardizing its bids.  NLS's arguments, however, are at odds with current Board precedent.

After the ALJ ruling and before the Board rendered its decision here, the Board decided Lutheran Heritage, 343 N.L.R.B. 646 (2004).  Lutheran Heritage clarified the nature of the Board's inquiry and confirmed the Board's prior caselaw that "mere maintenance" of a rule that "would reasonably tend to chill employees in the exercise of their Section 7 rights" is unlawful under Board caselaw, Lafayette Park, 326 N.L.R.B. at 825, and that there need not be any evidence of actual chilling of union activity as NLS claims.

In Lutheran Heritage, the Board articulated a two-step framework for determining whether an employer's maintenance of a work rule violates section 8(a)(1).  First, if the rule explicitly restricts section 7 activity, it is unlawful.  Id. at 646.  Second,

even if the rule does not explicitly restrict section 7 activity, it is nonetheless unlawful if "(1) employees would reasonably construe the language [of the rule] to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights." Id. at 647.

Here, the Board relied on the first prong of the second part of the test. It found that although the NLS rule did not explicitly restrict section 7 activity, employees would reasonably construe the language of the rule to prohibit section 7 activity under Lutheran Heritage. The plain language of the confidentiality provision provides: "Disclosure of these terms [of employment] to other parties may constitute grounds for dismissal." The Board's finding that this language could be fairly read to extend to disclosure of terms of employment to union representatives is supportable. The precise subject matter of the forbidden disclosure -- terms of employment, including compensation -- went to a prime area of concern under section 7.[3]

---

[3]    NLS asserts that the confidentiality provision is lawful because the plain text of the provision did not forbid employees from talking to each other or to union organizers. This argument fails to address the Board's Lutheran Heritage analysis, which holds that a provision is unlawful if employees would reasonably believe it forbids such communication.

The Board's interpretation was consistent with its prior caselaw.[4] See Cintas Corp., 344 N.L.R.B. 943, 943 (2005) (finding overbroad a confidentiality provision prohibiting "the release of 'any information' regarding '[the company's] partners' [because it] could be reasonably construed by employees to restrict discussion of wages and other terms and conditions of employment with their fellow employees and with the Union"), enforced, 482 F.3d 463 (D.C. Cir. 2007).

NLS argues that the Board should have considered that the confidentiality provision was justified by legitimate business reasons, citing Republic Aviation Corp. v. NLRB, 324 U.S. 793

_____

[4] NLS alludes to but does not develop an argument that the Board's result is inconsistent with the prior caselaw, as demonstrated by the ALJ's reading of the caselaw. We set aside NLS's waiver and consider the point. We find no such inconsistency.

In interpreting NLS's provision as a "less serious infringement on its employees' Section 7 rights," the ALJ relied on cases involving more narrowly drafted confidentiality provisions than the one at issue here. See, e.g., K-Mart, 330 N.L.R.B. 263 (1999) (prohibition on disclosing "company business and documents" did not by its terms include employee wages or working conditions and made no reference to employee information); Lafayette Park Hotel, 326 N.L.R.B. at 826 (rule banning discussion of "hotel-private" information that did not on its face cover employee wage discussion). Furthermore, under Lafayette Park and Lutheran Heritage's "mere maintenance" rule, the Board did not need to consider the employer's reasons for the rule. Cf. Desert Palace, Inc., 336 N.L.R.B. 271, 272 (2001), (upholding employer's policy of confidentiality on matters relating to its investigation of an allegation that an employee was dealing drugs). Furthermore, since its 1990 decision in Kinder-Care Learning Ctrs., Inc., 299 N.L.R.B. 1171 (1990), the Board has consistently held that when a rule's plain language restricts employees' ability to communicate their conditions of employment to third parties it violates section 8(a)(1). Id. at 1172 (finding ban on "parent communication" unlawful).

-17-

(1945). See id. at 798 (noting that in section 7 analysis "[o]pportunity to organize and proper discipline are both essential elements in a balanced society"); see also Tex. Instruments, Inc. v. NLRB, 637 F.2d 822, 833 (1st Cir. 1981). Nothing in Republic Aviation compelled the Board to apply a balancing test here. While the Board could have chosen to structure its rule differently and engage in a balancing analysis, we owe deference to its decision not to do so. Further, as a practical matter, a more narrowly drafted provision would be sufficient to accomplish NLS's goal in maintaining confidentiality in bidding for contracts. See, e.g., Cintas Corp., 482 F.3d at 470 ("A more narrowly tailored rule that does not interfere with protected employee activity would be sufficient to accomplish the Company's presumed interest in protecting confidential information."). We cannot say the Board's interpretation was unreasonable. Some may think this result unattractive, but the Board's rule is intended to be prophylactic and in any event is subject to deference.

C.        The Termination of Dupuy's Employment

NLS has conceded that Dupuy was dismissed for violating the confidentiality provision. "[W]here discipline is imposed pursuant to an overbroad rule, that discipline is unlawful regardless of whether the conduct could have been prohibited by a lawful rule." Double Eagle Hotel & Casino, 341 N.L.R.B. 112, 112 n.3 (2004), enforced, 414 F.3d 1249 (10th Cir. 2005); see also Opryland Hotel, 323 N.L.R.B. 723, 728 (1997). While Chairman

-18-

Schaumber indicated he might question the rule, he conceded he was bound by the precedent set in Double Eagle Hotel, 341 N.L.R.B. 112.[5]

NLS claims that the discharge was lawful, relying on Wright Line, a Div. of Wright Line, Inc., 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981) to argue that NLS can avoid liability if it demonstrates that it would have discharged Dupuy even in the absence of an unlawful reason. NLS contends that it would have terminated Dupuy even in the absence of the confidentiality provision because he was "insubordinate and disruptive." These arguments misconstrue the Board's precedent. It also argues that even if its confidentiality provision was unlawful, Dupuy's dismissal did not violate the act because he was not engaged in union or concerted protected activity.

Wright Line sets forth the test for assessing cases where the dispute turns on employer motive: whether the employer discharged an employee because of the employee's union affiliation, or whether he acted because of some factor unrelated to the employee's union status. 662 F.2d at 901. Wright Line, however, does not govern here. Under the Board's precedent, where the Board finds an employer rule is invalid, discharge for violating that

---

[5] To attack this principle, NLS cites only an ALJ's decision in Electronic Data Systems Corp., No. 36-CA-7434, 1996 WL 33321516 (N.L.R.B. Div. of Judges June 11, 1996), where the ALJ did not find an employee's dismissal pursuant to an overbroad confidentiality rule unlawful. The ALJ's unreviewed opinion is not binding on the Board or on this court.

rule is invalid.  See Saia Motor Freight Line, Inc., 333 N.L.R.B. 784, 785 (2001) ("Because [the employee] was disciplined for violating the [employer]'s unlawful overly broad . . . rule, that discipline itself constitutes a violation of Section 8(a)(3) and (1), without consideration of Wright Line's dual-motivation analysis.").

The Board did not err in not considering that Dupuy would have been discharged in the absence of a violation of the confidentiality provision.  The Board supportably relied on its own precedents to determine that any discharge pursuant to an unlawful rule is itself unlawful.  "The fact that one reason for [an employee's] reprimand was lawful in no way diminishes the fact that the other reason was unlawful."  A.T. & S.F. Mem'l Hosps., Inc., 234 N.L.R.B. 436, 436 (1978).

We deny NLS's petition for review and enter judgment enforcing the order of the Board.