# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 17, 2014

Decided July 17, 2015
Amended August 7, 2015

No. 14-1001

JAMISON JOHN DUPUY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

On Petition for Review of an Order
of the National Labor Relations Board

*Jamison John Dupuy*, *pro se*, argued the cause and filed the briefs for petitioner.

*Douglas Callahan*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

Before: TATEL and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Eleven years is a long time to wait for backpay; doubly so when no interest accrues over those eleven years. Yet, after a federal court of appeals entered judgment enforcing Jamison John Dupuy's right to reinstatement and backpay with interest for his unlawful termination, the National Labor Relations Board entered into a settlement agreement with Dupuy's former employer under which Dupuy's backpay would be paid on those sparing terms over Dupuy's objection. The Board also ruled that reinstatement to a position with reduced pay, benefits, and job security satisfied the court's judgment because it paralleled what current employees received. As a matter of law, the Board reasonably used current employees' pay and benefits as a reference point. But with the exception of the backpay calculation, the Board provided only scant evidence to corroborate its critical factual findings about comparable employment terms. Because the Board failed adequately to explain or to substantiate those aspects of its decision, we grant the petition in part, vacate the Board's ruling, and remand.

# I

## Statutory Framework

Congress enacted the National Labor Relations Act in 1935 to "eliminate the causes of certain substantial obstructions to the free flow of commerce * * * by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151. To that

end, Congress empowered the National Labor Relations Board to "prevent any person from engaging in any unfair labor practice * * * affecting commerce." *Id.* § 160(a). Oftentimes, the Board learns of a potential violation through the filing of an unfair labor practice complaint by a "charging party." *See* 29 C.F.R. § 101.2.

If the Board finds, after notice and a hearing, that an unfair labor practice has occurred, the Board "shall issue * * * an order requiring" the person violating the Act "to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of" the Act. 29 U.S.C. § 160(c). The Board can then "petition any court of appeals of the United States * * * within any circuit * * * wherein the unfair labor practice in question occurred" for enforcement of its order. *Id.* § 160(e). Once that petition is filed, "the court * * * shall have jurisdiction of the proceeding and of the question determined therein." *Id.* The jurisdiction of the court "shall be exclusive and its judgment and decree shall be final," except that the Supreme Court may review it upon granting a writ of certiorari. *Id.*

After "the entry of a court judgment enforcing" Board-ordered remedial action, 29 C.F.R. § 102.52, "the Board has the responsibility [for] obtaining compliance with that judgment," *id.* § 101.15. To that end, "the Regional Director shall seek compliance from all persons having obligations" under the judgment, and "shall make a compliance determination as appropriate." *Id.* § 102.52. If the Regional Director "finds that the respondent has failed to live up to the terms of the court's judgment, the General Counsel may, on behalf of the Board, petition the court to hold the respondent in contempt of court." *Id.* § 101.15.

A charging party who objects to the Regional Director's compliance determination may appeal the determination to the Board's General Counsel, 29 C.F.R. § 102.53(a), and if still dissatisfied, may petition the Board for review, *id.* §§ 102.53(c)–(d). The Board's denial of review "will constitute an affirmance of the decision of the General Counsel." *Id.* § 102.53(d).

If the charging party still remains "aggrieved" after "a final order of the Board," that party may petition for review of the Board's order in this circuit or in any other federal circuit court of appeals in which the unfair labor practice occurred. 29 U.S.C. § 160(f). On review "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall * * * be conclusive." *Id.*

**Factual Background**

Northeastern Land Services ("Northeastern") is a temporary employment agency that supplies right-of-way agents for clients in the natural gas and fiber-optics industries.[1] From July to October 2001, Jamison John Dupuy worked as a right-of-way agent for Northeastern on a project for El Paso Energy, one of the company's clients. Dissatisfied with Northeastern's policy for reimbursing work-related expenses, Dupuy contacted El Paso in October 2001 asking it to reimburse some of his computer expenses. *See Northeastern Land Services, Ltd.*, 352 NLRB 744, 744–745

---

[1] Right-of-way agents "perform various activities related to the acquisition of land rights," including "perform[ing] title research to determine who owns the land, perform[ing] title abstracts, survey permitting[,] and [] negotiat[ing] for land rights, whether easements or fee properties." *Northeastern Land Services, Ltd.*, 352 NLRB 744, 744, 747–748 (2008).

(2008). Northeastern terminated Dupuy for violating a confidentiality agreement that prohibited him from disclosing the terms of his compensation.

Dupuy filed an unfair labor practice charge with the National Labor Relations Board in 2001. Seven years later, a two-member panel of the Board issued a Decision and Order finding that Northeastern's ban on disclosing compensation terms violated the National Labor Relations Act. The First Circuit enforced the Board's Order, *see Northeastern Land Services, Ltd. v. NLRB*, 560 F.3d 36 (1st Cir. 2009), but the Supreme Court vacated that judgment in light of *New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010), because the two-member Board lacked the necessary quorum to act, *see Northeastern Land Services, Ltd. v. NLRB*, 561 U.S. 1021 (2010).

On remand from the Supreme Court, a three-member panel of the Board reaffirmed the previous Decision and Order, and the First Circuit again entered judgment enforcing the Order. *See NLRB v Northeastern Land Services, Ltd.*, 645 F.3d 475 (1st Cir. 2011).

As relevant here, the First Circuit's judgment enforcing the Board Order required Northeastern to offer Dupuy "full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent job, without prejudice to his seniority or any other rights or privileges previously enjoyed," and to "[m]ake Jamison Dupuy whole for any loss of earnings and other benefits suffered as a result of the unlawful action taken against him[.]" *Northeastern Land Services, Ltd.*, 355 NLRB 1154 (2010) (enforced by *Northeastern Land Services*, 645 F.3d at 484, and incorporating the terms of *Northeastern Land Services, Ltd.*, 352 NLRB 744, 746 (2008)). In the "Remedy" section of its Order, the Board was explicit that the

backpay was to be accompanied by "interest as computed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987)." *Northeastern Land Services*, 352 NLRB at 746. As relevant here, *New Horizons* is a longstanding Board precedent that requires interest on backpay "to accrue commencing with the last day of each calendar quarter of the backpay period for the amount due and owing for each quarterly period and *continuing until compliance with the Order is achieved*." 283 NLRB at 1174 (emphasis added).

Following the First Circuit's affirmance of the Board's Order, a Compliance Officer for the Board negotiated a settlement agreement with Northeastern, without Dupuy's concurrence, under which Northeastern would offer Dupuy reinstatement by December 30, 2011. *See* Settlement Agreement ¶ 5, J.A. 55. The Settlement Agreement also provided Dupuy $201,788.50 in compensation, comprising $124,115.33 in backpay and $77,673.17 in accrued interest. *Id.* ¶ 7. The Agreement called for monthly installment payments of $1,500 over a period of more than eleven years, from January 2012 to March 2023. *See* Letter from Deputy Regional Attorney Scott Burson to Jamison John Dupuy, Feb. 28, 2012, at 3 ("Burson Letter"); Board Supp. App. 3.

Notwithstanding the Order's direction that interest be paid consistent with *New Horizons*, the Settlement Agreement waived any claim to interest that would have accrued during the payment period. That decision deprived Dupuy of $41,906.78 in compensation. In exchange, Northeastern agreed simply to comply with the terms of the Agreement. *See* Settlement Agreement ¶ 14, J.A. 56–57. The Settlement Agreement also provided that Northeastern would mail its monthly installment payments to the Board in Boston, payable to Dupuy, after deducting any Social Security and

withholding taxes, and that it would issue IRS Forms W-2 and 1099 to Dupuy for the payments. *Id.* ¶¶ 10–12, J.A. 56.

To ensure compliance, a Security Agreement appended to the Settlement Agreement gave the Board a security interest in:

> "A. All real property, of which there is none currently owned by [Northeastern];
>
> B. All fixtures, equipment, machinery, vehicles, inventory, accounts receivable, and bank accounts;
>
> C. All proceeds from the above collateral; and,
>
> D. All increases, substitutions, replacements, additions and accessions to the above collateral."

Security Agreement ¶ 1, J.A. 60–61.

On December 13, 2011, Dupuy emailed the Board's Compliance Officer to notify her that he would be unavailable between December 21, 2011 and January 11, 2012. J.A. 20. Nonetheless, on December 20, 2011, Northeastern President and Chief Executive Officer Jeffrey Deuink emailed Dupuy an "unconditional offer of reinstatement." Email from Northeastern to Jamison John Dupuy, Dec. 20, 2011, J.A. 22–23 ("Reinstatement Letter"). That letter offered Dupuy a position as a "land agent" for a project starting the week of January 2, 2012 in eastern New York and northeastern Pennsylvania. J.A. 22. The letter noted that "[y]our participation on the project will, of course, be subject to the approval of the client as is industry practice." *Id.* The letter also provided that, "[i]f we do not receive this form back from you by January 3, 2012, we will assume that you are not

interested in returning to work for The NLS Group and this offer will automatically expire." J.A. 23.

**Procedural History**

Two weeks after the offer of reinstatement, Dupuy informed Northeastern and the Board's Regional Director that he did not agree to the Settlement Agreement's terms or accept the offer of reinstatement. *See* Letter from Jamison John Dupuy to Rosemary Pye, NLRB Regional Director – Region 1, Jan. 3, 2012, J.A. 33; Letter from Jamison John Dupuy to Jeffrey Deuink, Jan. 3, 2012, J.A. 42. He claimed that the Board had unlawfully waived interest during the payment period, had failed to impose personal liability for the monetary award on Jeffrey Deuink, Northeastern's CEO, and had not followed its own regulations and case-handling manual in its enforcement efforts. *See* Letter to Rosemary Pye, J.A. 33–41. Dupuy also argued that Northeastern had failed to make a valid offer of reinstatement because, in his view, (i) the terms and conditions of reinstatement were out of step with industry practice and with his previous employment at Northeastern, (ii) the reinstatement offer failed to disclose many of the material terms of employment, and (iii) the time limits imposed on his acceptance were made in bad faith. *See* Letter to Jeffrey Deuink, J.A. 42; Letter to Rosemary Pye, J.A. 35–36.

In response, the Board's Regional Director entered a formal decision "unilaterally accept[ing]" the Settlement Agreement. Regional Director's Compliance Determination, Feb. 28, 2012, J.A. 50. In so doing, the Regional Director determined that "the position offered was within the scope of your professional abilities and the terms and conditions offered were consistent with those of other similarly situated employees of Respondent – a valid offer of reinstatement

need offer no more." *Id.*, J.A. 51. The Regional Director cited no evidence of the current terms and conditions of employment of Northeastern's right-of-way agents.

With respect to the forgone interest, the Regional Director explained that "it is a compromise settlement of a complex post-judgment backpay matter" that provides "a better opportunity to obtain compensation for you[] than litigation offers." Compliance Determination, J.A. 51. What was particularly complex about this single-employee backpay remedy and why specifically the Board feared litigation over such commonplace remedial terms were left unexplained.

Dupuy appealed the Compliance Determination to the Board's Acting General Counsel, who denied the appeal "substantially for the reasons in the Regional Director's letter[.]" Letter from Lafe E. Solomon to Jamison John Dupuy, March 26, 2013, J.A. 68.

Dupuy appealed to the Board. In a one-paragraph opinion, the Board denied Dupuy's appeal, stating that, "under the circumstances, the Regional Director did not err in accepting the [S]ettlement [A]greement." *Northeastern Land Services, Ltd.*, 2013 WL 4761157, at *1 (NLRB Sept. 4, 2013). Dupuy petitioned the Board for reconsideration, which the Board denied. *Northeastern Land Services, Ltd.*, 2013 WL 6229182 (NLRB Dec. 2, 2013).

## II

## Analysis

### *Standard of Review*

While our review grants substantial deference to the Board, we will reverse if its decision "relied upon findings

that are not supported by substantial evidence, failed to apply the proper legal standard, or departed from its precedent without providing a reasoned justification for doing so." *E.I. Du Pont De Nemours & Co. v. NLRB*, 682 F.3d 65, 67 (D.C. Cir. 2012); *accord, e.g.*, *Carpenters and Millwrights, Local Union 2471 v. NLRB*, 481 F.3d 804, 808–809 (D.C. Cir. 2007).

The Board argues that we may only vacate its Order if we find it to be an abuse of "the broad discretion the Board may exercise in the settlement of unfair labor practice cases." *Textile Workers Union of America v. NLRB*, 315 F.2d 41, 42 (D.C. Cir. 1963). That might be true if the settlement had been obtained in the course of the Board's prosecution of an unfair labor practice charge and the dispute arose prior to a federal court judgment enforcing the Board Order. The Board's own precedent gives the Board wide latitude to settle cases at that prosecutorial stage. *See Independent Stave Co.*, 287 NLRB 740, 743 (1987) (identifying standards for approving settlement agreements). That is what almost all of the cases the Board relies upon involved.[2]

---

[2] *See Oil, Chemical & Atomic Workers Int'l Union v. NLRB*, 806 F.2d 269, 269 (D.C. Cir. 1986) (reversing as-yet unenforced Board orders); *Jackman v. NLRB*, 784 F.2d 759, 764 (6th Cir. 1986) (Board's General Counsel may decline to prosecute unfair labor practice charges prior to court enforcement); *George Ryan Co. v. NLRB*, 609 F.2d 1249, 1250–1251 (7th Cir. 1979) (informal post-complaint and pre-enforcement settlement); *Oshkosh Truck Corp. v. NLRB*, 530 F.2d 744, 745 (7th Cir. 1976) (unenforced order); *Containair Systems Corp. v. NLRB*, 521 F.2d 1166, 1174 (2d Cir. 1975) (same); *International Ladies' Garment Workers Union, Local 415-475 v. NLRB*, 501 F.2d 823, 824 (D.C. Cir. 1974) (withdrawal of a complaint prior to Board hearing); *NLRB v. Oil, Chemical & Atomic Workers Int'l Union*, 476 F.2d 1031, 1033 (1st

This case, however, arises in a materially different procedural posture, implicating another strand of Board precedent. A court judgment enforcing the Board's Order has issued, and Dupuy is challenging the Board's determination that Northeastern need only partially comply with that judicial order. However broad the Board's discretion may be to settle its cases prior to their embodiment in a court order, once the Board turns to the task of ensuring an employer's compliance with a final court judgment, the Board's own precedent has disclaimed any authority to modify the court's order. *See, e.g.*, *D.L. Baker, Inc.*, 351 NLRB 515, 525 n.31 (2007) (Board is "not at liberty to modify an Order that has been enforced by a court of appeals[.]").

Accordingly, in enforcing compliance, the Board must apply the correct legal standards, ground its factual findings in substantial evidence, and give reasoned explanations for any

---

Cir. 1973) (petition for court enforcement); *Concrete Materials of Georgia, Inc. v. NLRB*, 440 F.2d 61, 62 (5th Cir. 1971) (same); *W.B. Johnston Grain Co. v. NLRB*, 365 F.2d 582, 587 (10th Cir. 1966) (same); *Local 282, Int'l Brotherhood of Teamsters v. NLRB*, 339 F.2d 795, 797 (2d Cir. 1964) (same); *Textile Workers Union of America*, 315 F.2d at 42 (same); *Textile Workers Union of America v. NLRB*, 294 F.2d 738, 739 (D.C. Cir. 1961) (resolution prior to Board hearing). Of course, even in that procedural posture, we will not uphold an order that departs from the Board's own settlement standards without explanation. *See Oil, Chemical & Atomic Workers Int'l Union v. NLRB*, 806 F.2d 269, 273–274 (D.C. Cir. 1986).

Two other cases cited by the Board do not involve Board proceedings at all. *See Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 80 (1991) ("National Labor Relations Act cases are not necessarily controlling in situations, such as this one, which are governed by the Railway Labor Act."); *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975) (class action).

departure from precedent on the scope of its post-enforcement authority to alter court orders. *See Carpenters and Millwrights*, 481 F.3d at 808–809. Additionally, the Board's Compliance Manual provides that "Regions should strive to obtain 100 percent of * * * backpay," and that "[a]ny compromise from this standard must be warranted by the facts, law, and circumstances of the case." NLRB Casehandling Manual, Part 3, Compliance Proceedings (Nov. 2013) § 10592.4. In sum, however broad the Board's enforcement discretion, it does not extend to turning its back on its own precedent and policy without reasoned explanation and substantial evidence undergirding its determinations.[3]

Applying that standard, the Board's decision falls short in two ways: It departs without any reasoned explanation from longstanding Board precedent constraining the Board's ability to alter the terms of a judicially enforced Order, and it relies on a finding of substantial equivalence between Dupuy's old job and his reinstatement offer that is not supported by substantial—or, frankly, by any—evidence.

---

[3] The Board cited *Amalgamated Utility Workers v. Consolidated Edison Co.*, 309 U.S. 261 (1940), as support for its broad autonomy to settle cases. That case did involve a judicially enforced Board order. Unfortunately for the Board, the relevant similarities end there. *Amalgamated Utility* held only that charging parties do not have the right to *enforce*, through contempt proceedings, court-enforced Board orders. *Id.* at 266. With respect to judicial review of a Board enforcement order under 29 U.S.C. § 160(f), which is what Dupuy seeks, the Supreme Court expressly acknowledged that the Act does permit charging parties "to *contest* a final order of the Board[.]" *Id.* (emphasis in original).

*Waiver of payment-period interest*

The First Circuit's judgment enforced the Board's Order mandating that Northeastern "[m]ake Jamison Dupuy whole for any loss of earnings and other benefits suffered as a result of the unlawful action taken against him, in the manner set forth in the remedy section of this decision." *Northeastern Land Services*, 352 NLRB at 746 (enforced by *Northeastern Land Services, Ltd.*, 645 F.3d at 484). The remedy section, in turn, was explicit that interest on backpay would be provided consistent with *New Horizons*, which requires interest to accrue "until compliance with the Order is achieved." 283 NLRB at 1174.

The Board does not dispute that compliance will not be achieved until Dupuy has been made whole. Nor does it dispute that, to make Dupuy whole, the First Circuit's judgment requires that interest continue to accrue until the backpay is distributed in full. *See Northeastern Land Services, Ltd.*, 645 F.3d at 484 (enforcing *Northeastern Land Services*, 352 NLRB at 746 (incorporated by *Northeastern Land Services*, 355 NLRB 1154) (ordering Northeastern to "[m]ake Jamison Dupuy whole for any loss of earnings and other benefits suffered as a result of the unlawful action taken against him")). In other words, interest throughout the payment period is just as integral a part of the First Circuit's make-whole judgment as reinstatement and the backpay requirement itself.

The Board does not dispute the content or legal effect of the First Circuit's judgment. It just asserts a unilateral right to "waive[]" away portions of the judgment as it sees fit. *Northeastern Land Services*, 2013 WL 4761157, at *1 n.1; Board Br. 11, 17, 18, 26, 42. The Board never explains the source of its authority to singlehandedly make such a waiver,

though. The Order does not so much as nod to statutory or regulatory text or Board precedent. Far worse still, in past cases the Board has repeatedly and expressly disclaimed any right or ability to modify court-enforced remedial orders, and it provides no explanation at all, let alone a reasoned one, for its about-face here.

In *Scepter, Inc. v. NLRB*, 448 F.3d 388 (D.C. Cir. 2006), an employer petitioned the Board to alter a remedial order that this court had enforced, arguing that modification was necessary to prevent a windfall for the charging party. In stark contradiction of its position here, the Board told this court that it had "no authority to modify the remedy specified in a court-enforced order unless it had in that order reserved for later consideration a specific question pertaining to that remedy." *Id.* at 390. We held that "[t]he Board is correct" because, under 29 U.S.C. § 160(e), it is "obvious[]" that the Board "cannot modify an order over which the court has 'exclusive' jurisdiction or that the court has enforced in a final judgment." *Scepter*, 448 F.3d at 390–391; *accord NLRB v. Gimrock Construction, Inc.*, 695 F.3d 1188, 1193 (11th Cir. 2012) (once the court had enforced a Board order, "only th[at] court had the power to modify its order"); *NLRB v. Mastro Plastics Corp.*, 261 F.2d 147, 148 (2d Cir. 1958) ("If respondents believed that they had sufficient grounds to justify [deviating from a court-enforced order], their *only proper recourse* was in timely fashion to petition this court for modification of its clear mandate.") (emphasis added).[4]

---

[4] Section 160(e), 29 U.S.C., provides, in relevant part, that "[u]pon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United

*Scepter* and those other appellate decisions have a lot of company. For almost four decades, and in at least nine separate decisions, the Board has taken the position that it "has no jurisdiction to modify a court-enforced order." *Willis Roof Consulting, Inc.*, 355 NLRB 280, 280 n.1 (2010).[5] And the Board reaffirmed that position just last month. *See New York Party Shuttle, LLC*, 2015 WL 3732893, *1 n.3 (NLRB June 12, 2013) ("[T]he Board has no jurisdiction to modify an Order that has been enforced by a court of appeals because, upon the filing of the record with the court of appeals, the jurisdiction of that court is exclusive and its judgment and decree are final, subject to review only by the Supreme Court.") (citing *Scepter*, 448 F.3d 388).

The Board's decision blinks away *Scepter* and the large body of like-minded precedent. No effort to explain its U-turn is made. Instead, the Board argues that its waiver of

---

States upon writ of certiorari or certification as provided in section 1254 of Title 28."

[5] *See also*, *e.g.*, *D.L. Baker, Inc.*, 351 NLRB at 525 n.31 (Board is "not at liberty to modify an Order that has been enforced by a court of appeals[.]"); *In re Grinnell Fire Protection Systems Co.*, 337 NLRB 141, 142 (2001) ("[T]he Board's Order has already been enforced by the Fourth Circuit, and the Supreme Court has denied certiorari, [so] we no longer possess jurisdiction to modify that Order."); *Regional Import and Export Trucking Co.*, 323 NLRB 1206, 1207 (1997) ("[T]he Board's order has already been enforced and accordingly we no longer have jurisdiction to modify that Order."); *Traverse City Osteopathic Hospital*, 260 NLRB 1060, 1060 (1982) ("[S]ince * * * the Board's Order has already been enforced, we no longer possess jurisdiction to modify that Order."); *Royal Typewriter Co.*, 239 NLRB 1, 2 (1978) ("[Because] the Board's order has already been enforced and is now the subject of contempt proceedings, we are of the view that we no longer possess jurisdiction to either modify or clarify the Order.").

payment-period interest did not modify the enforced Order, because the Order "did not liquidate the amount of backpay owed[.]" Board Br. 27.

That mixes apples and oranges. The argument confuses the *amount* of backpay owed, which the Board's Order expressly reserved for later calculation, with the constituent *elements* of the remedial judgment, which the First Circuit's order locked in. The Board's reserved authority to undertake the traditional steps for computing backpay does not give it the power to eschew that task altogether and just declare that enforcement would go over easier without any backpay. Neither under Board precedent can it entirely erase payment-period interest from the First Circuit's judgment enforcing the Order.

The Board also argues that the waiver of interest was justified "by the immediate availability of relief and the elimination of the substantial risk involved in litigating the issues remaining in this case." Board Br. 27. Eleven years waiting for full payment is hardly "immediate," and the Board's boilerplate litigation-risk claim is not backed up by anything.

In any event, the Board's theory would give it the wholesale power to bowdlerize a court order for no reason other than litigation efficiency. The source of such authority and the justification for it appear nowhere in the Board's decision. After all, the terms of the remedial Order, including the interest provision, were of the Board's own choosing. The First Circuit's judgment simply enforced the remedial Order that the Board itself fashioned and then twice pressed the court to affirm. Buyer's remorse at the enforcement stage, particularly without any suggestion of a surprising change in circumstances or any other reasoned justification, is a

woefully insufficient excuse for the Board backhanding almost four decades of its own precedent insisting that it cannot do exactly what it did.

When all is said and done, the Board might very well be proven right that the deal on the table is the best Dupuy can get out of Northeastern. But the Board can only make bargains with chips that it possesses. If a court-enforced remedial Order is beyond its jurisdiction to amend—as the Board has said it is for the last thirty-seven years—then the Board has no power to deal away particular elements of that Order, even if it sincerely believes that deal-making would be in the charging party's best interest.

### *Reinstatement*

The First Circuit's judgment also required Northeastern to "offer Jamison Dupuy full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent job, without prejudice to his seniority or any other rights or privileges previously enjoyed." *Northeastern Land Services*, 352 NLRB at 746 (enforced by *Northeastern Land Services, Ltd.*, 645 F.3d at 484).

The Board determined that Northeastern met this obligation when it offered Dupuy a "Temporary Employment Agreement" to work as a land agent on a project in eastern New York and northeastern Pennsylvania, with the exact date and location of the project not yet settled. Reinstatement Letter, J.A. 22. Dupuy was to be paid $250 a day "based on a 5 or 6 day contract to be determined." *Id.* The per diem rate was set at "the standard GSA rate of $132 a day," with mileage reimbursed at the then-IRS-approved rate of 55.5¢ per business mile. *Id.* Use of personal cell phones and computers for project business was reimbursable at a rate of $5.00 a day. *Id.* And the project allowed a "mobilization and

demobilization allowance" of "one travel day and a maximum 500 miles." *Id.* Finally, Dupuy's participation was "subject to the approval of the client as is industry practice." *Id.*

Dupuy argues that those conditions were substantially worse than what he enjoyed when he last worked for Northeastern. That may be true, but it is also beside the point. Reinstatement aims to restore "the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941). The relevant yardstick thus is not the job Dupuy held over a decade ago, but the job he would have now if he had stayed in Northeastern's employ all that time. And, unfortunately, employment conditions can change for the worse as well as for the better. If Dupuy had stayed with Northeastern, he would have endured both the ups and the downs of a changing workplace. The Board thus quite reasonably measured reinstatement by reference to "the terms and conditions [Northeastern] offers those currently in the position you occupied." Burson Letter at 4–5, J.A. 47–48.

But asking the right question is only half of the Board's job. The Board also has to back up its answer with substantial evidence. The Board did just that with respect to the wage rate offered to Dupuy. By relying on the same records from which it calculated backpay, the Board reasonably concluded that the offered rate paralleled that paid to other similarly situated land agents. *See* Burson Letter at 4, J.A. 47.

The Board, however, has more work to do with respect to the other terms and conditions of employment. The most anyone at the Board ever said about the non-wage terms and conditions was the Deputy Regional Attorney's unadorned assertion that a "review of the Respondent's records establishes that the terms and wages are consistent with those

of other similarly situated employees of Respondent[.]" Burson Letter at 4, J.A. 47. The "wages" part of that sentence makes sense given the extensive analysis required to calculate the backpay owed. But nothing in the record substantiates the assertion that the other terms of employment are consistent with what other similarly situated employees receive. The Regional Director's Compliance Determination simply echoed that statement, J.A. 51, while the Acting General Counsel was mum on the topic, other than to affirm the compliance determination "substantially for the reasons in the Regional Director's letter[.]" Solomon Letter, J.A. 68. The Board itself was even less forthcoming, with no mention of the issue in its Order at all. *See Northeastern Land Services*, 2013 WL 4761157, at *1.

The Board's task, remember, was to find "substantial equivalence" between Dupuy's terms and conditions of employment and those of similarly positioned employees. *See Northeastern Land Services*, 352 NLRB at 746. But it takes two to compare. We cannot say that one thing is the same as another without knowing what that other thing is. Neither can the Board. The Board had no plausible basis for finding that Dupuy's terms and conditions were substantially equivalent to those of similarly situated employees without at least finding what the material terms and conditions of employment were for those other employees. Accordingly, on remand, the Board must consider all material terms and conditions of employment, not just compensation, in deciding whether Northeastern's offer of reinstatement was sufficient.

### *Dupuy's Remaining Challenges*

Dupuy raises three further challenges to the Board's decision. The first argument fails; the remaining two are better addressed by the Board on remand.

*First*, Dupuy argues that, rather than adopt an eleven-year, interest-free payment period, the Board should have pierced the corporate veil and imposed personal liability on Northeastern's Chief Executive Officer Jeffrey Deuink and Northeastern's Directors. The Board sensibly found no basis for doing so. Under Board precedent (which Dupuy does not challenge), the corporate veil may be pierced only when: "(1) there is such unity of interest, and lack of respect given to the separate identity of the corporation by its shareholders, that the personalities and assets of the corporation and the individuals are indistinct, *and* (2) adherence to the corporate form would sanction a fraud, promote injustice, or lead to an evasion of legal obligations." *White Oak Coal Co.*, 318 NLRB 732, 735 (1995). The Board decided those factors were not met, and Dupuy points to nothing that casts doubt on that conclusion.

For starters, Dupuy asserts that, during litigation before the First Circuit, Northeastern terminated its 401K group pension plan, leaving the corporation with title to enough money in non-vested employer contributions to satisfy the backpay award. That argument simply misreads Northeastern's 401K statement, which is explicit that "all plan assets [were] either distributed to participants or beneficiaries, transferred to another plan, or brought under the control of the [Pension Benefit Guaranty Corporation]." *Northeastern Land Services Ltd. Group 401K Plan, Form 5500 Data*, at 3 (March 13, 2012), J.A. 145. Termination of that plan thus did not free up any money to pay Dupuy. The argument also

misunderstands the law. Even if the plan's termination or some other event had freed up corporate funds, that is no argument for veil-piercing, at least in the absence of any claim of improper dissipation.

Dupuy also notes that Northeastern reduced its number of right-of-way agents in the years following the First Circuit's initial decision. It seems dubious that employees count as the kind of asset that can be fraudulently dissipated. But in any event, Dupuy cannot point to anything in the record that suggests a fraudulent motivation for that workplace reduction at all, let alone one designed to end-run the Board's Order.

Dupuy's last-ditch argument to pierce the corporate veil asserts that Northeastern is organized as a Subchapter S corporation, with its income passed through to Deuink for tax purposes. Maybe. But even if true, that contention simply describes how the Subchapter S corporate form works; it says nothing about why the corporate form should be cast off.

*Second*, Dupuy challenges the enforcement provisions of the Settlement Agreement as insufficient because Northeastern is judgment proof. The Settlement Agreement provides for "collection proceedings * * * in any court of competent jurisdiction" if Northeastern defaults on its payment obligations, and it further specifies that "[a]ll parties waive all further and other proceedings to which the parties may be entitled under the [National Labor Relations] Act or the Board's Rules and Regulations." Settlement Agreement ¶¶ 16, 21, J.A. 57, 59. Because we must return this case to the Board to modify its remedial terms, we leave it to the Board in the first instance to determine whether, in its judgment, any further enforcement guarantees will be needed.

*Third*, Dupuy argues that the Board should have forwarded him the checks that Northeastern has been sending

to the Board since 2012.  Again, because the Board must revisit its remedial Order, we will allow the Board to determine on remand the proper disposition of those funds in light of our opinion and any further proceedings.

## III

### Conclusion

We grant the petition for review in part, vacate the Board's Order, and remand for further proceedings consistent with this opinion.

*So ordered.*